BUCHALTER
A Professional Corporation
STEVEN BROWER (SBN: 93568)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: (714) 549-5150
Email: sbrower@buchalter.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EURAUPAIR INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> vs. <br><br> IRONSHORE SPECIALTY INSURANCE COMPANY, <br><br> Defendant. | Case No. <br><br> **COMPLAINT FOR:** <br> **1) DECLARATORY JUDGMENT;** <br> **2) BREACH OF CONTRACT;** <br> **3) TORTIOUS BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;** <br><br> **DEMAND FOR JURY TRIAL** |

## GENERAL ALLEGATIONS

### Jurisdiction and Parties

1. Pursuant to Local Rule 8-1, this Court has original jurisdiction over this matter, pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and the Defendant and there is more than $75,000 in controversy.

2. Plaintiff EurAuPair International, Inc. ("EurAuPair") is a not for profit public benefit cultural exchange program, organized and existing under the laws of the State of California, with a principal place of business in the State of California. EurAuPair is one of only 15 entities which is designated as a "sponsor" under the *au pair* program administered by the U.S. Department of State. The *au pair* program is actually a highly regulated cultural exchange visitor program which

includes the issuance of a specific type of visa (J-1), for qualified young people from abroad who, in exchange for providing up to 45 hours per week of child care assistance, live as a member of an American family, attend school, and receive a federally regulated minimum amount of stipend and a federally regulated minimum amount of free time to participate in American culture, among other rules and regulations.

3. Plaintiff is informed and believes, and therefore alleges, that Defendant Ironshore Specialty Insurance Company ("Ironshore") is a corporation, organized and existing under the laws of the State of Arizona, with a principal place of business in the State of New York. Ironshore is an insurance company which purports to be authorized to provide insurance in every state in the United States.

**Insurance Policy**

4. Plaintiff EurAuPair purchased, from Ironshore, a "Not-For-Profit Entity and Directors, Officers Liability Insurance Policy" which bore policy number 002171601 for the policy period October 1, 2015 to October 1, 2016. EurAuPair had previously purchased, from Ironshore, a policy which was virtually the same and which bore policy number 002171600 for the policy period October 1, 2014 to October 1, 2015. An actual copy of the policy is not attached hereto because, as a matter of notice pleading, Ironshore is aware of the terms and conditions of the Ironshore Policy and because provisions of such document are confidential.

5. The Ironshore Policy includes specifically includes up to $5 million in coverage for "violation of the Sherman Antitrust Act or similar federal, state or local statutes or rules" subject to a retention (deductible) of $25,000.

6. Plaintiff is informed and believes, and therefore alleges, that Ironshore drafted the Ironshore Policy without consultation with, or modification by, EurAuPair, except to the extent, if any, that Ironshore offered, often for an additional premium, the option of adding other and further provisions to the

Ironshore Policy, which provisions were also drafted by Ironshore. As such, any ambiguity in the Ironshore Policy must be construed against Ironshore and in favor of coverage for EurAuPair.

7. The obligations owed by the Ironshore to EurAuPair, under the Ironshore Policy, continue in full force and effect as of this date, subject to the terms and conditions thereof. Plaintiff has complied with every obligation under the Ironshore Policy, except those which have been excused by the conduct of the Insurers, if any.

**Underlying Claim**

8. On or about November 13, 2014, a purported class action was filed against all 15 of the federally authorized *au pair* program sponsors in the U.S. District Court in Colorado. The first named plaintiff is Beltran and the suit is pending as case number 14-cv-03074 in the US District Court for the District of Colorado ("Beltran Suit").

9. Although there are other claims asserted against a sub-set of the sponsors, EurAuPair is only named as a defendant in the First Claim for Relief, 15 USC § 1 et seq., which is also known as the Sherman Anti-Trust Act. Such claims are specifically covered pursuant to the terms of the Ironshore Policy.

**Tender and Denial of Beltran Suit**

10. The Beltran Suit was served on EurAuPair in or about January, 2015. This was the first Sherman Anti-Trust case in which EurAuPair had every been named as a party.

11. The retention (deductible) on the Ironshore Policy is $25,000. However, the retention on other insurance policies, which were more routinely utilized by EurAuPair, and with which its management was therefore more familiar, was $100,000.

12. When EurAuPair received the Beltran Suit it believed that such suit was unlikely to be significant because the *au pair* program is regulated by the

United States Department of State. Moreover, EurAuPair, which is neither the largest nor the smallest of the 15 *au pair* sponsors, like most or all of the other sponsors, does not actually employ or pay any of the *au pairs*. Moreover, EurAuPair was in the sub-class of nine sponsors who were being accused only of Sherman Anti-trust, and was not part of the sub-class of six sponsors who were accused of FLSA violations, breach of fiduciary duty and other claims as set forth in the pleadings in the Beltran Suit. Therefore, EurAuPair concluded that it was unlikely that the expense in the suit would be significant enough to involve its insurers because its insurance policies had significant deductibles.

13. Therefore, EurAuPair proceeded to retain counsel and joined, along with the other 15 sponsors, each of whom retained their own counsel, in moving toward a Motion to Dismiss which they hoped would be dispositive.

14. It appeared, during the first 9 months of the case, that EurAuPair made the right decision. Defense counsel billed about $20,000 for the first month of service (April, 2015), and about $10,000 for the second month (May, 2015). Over the next 9 months the bill was never more than $10,000, with only two of those over $2,500, and with two months for which the billing was <u>zero</u>. As of February, 2016, the total billing on the matter was under $54,000, far less than the $100,000 deductible amount with which EurAuPair was familiar. It was only in April, 2016, when the bill was received for March, 2016, that EurAuPair realized that the matter was not going to be resolved for an amount small enough to avoid insurance.

15. Therefore, in or about April, 2016, EurAuPair tendered the Beltran Suit to several of its insurers, including Ironshore.

16. Upon receipt of the tender from EurAuPair, its insured, Ironshore had the right and the duty to fully and timely investigate the Beltran Suit and to make an appropriate coverage determination.

17. EurAuPair is informed and believes, and therefore alleges, that Ironshore considered all facts, evidence and other information which it believed

was necessary and appropriate to make a full coverage determination. EurAuPair is further informed and believes, and therefore alleges, that Ironshore obtained full and complete cooperation from EurAuPair in that EurAuPair was ready, willing and able to respond to any requests for documents and/or requests for access to individuals who would have additional information which might be relevant to the coverage investigation.

18. EurAuPair is informed and believes that Ironshore assigned responsibility for handling of the Beltran Suit to John Alberti ("Alberti"), a Claims Examiner with Ironshore. EurAuPair is further informed and believes that the matter was assigned to Alberti because he was the most experienced claims handler for Ironshore, he was familiar with California law as it applied to insurance policies, and he had the knowledge and experience to make strategic decisions regarding coverage decisions, and he had the ability to fully and clearly communicate such coverage decisions for the strategic benefit of Ironshore.

19. On or about May 17, 2016, Ironshore, acting through its authorized representative Alberti, and ratified by supervisory and management personnel, advised EurAuPair that it was denying coverage for the Beltran Suit. That denial was reconsidered and reconfirmed by Ironshore in a letter dated June 1, 2016 (the "Ironshore Denial Letter").

**Bad Faith Mediation**

20. The Beltran Suit continued forward and EurAuPair was required to defend the suit without the benefits of the insurance coverage properly due and owing pursuant to the Ironshore Policy. However, the continuing expense of that litigation has now imperiled the public benefit mission of EurAuPair because of the financial strain which it has placed on EurAuPair.

21. In or about July, 2017, EurAuPair determined that it would be necessary to retain insurance coverage counsel and retained Steven Brower to act as insurance counsel.

22. The Ironshore Policy has a provision entitled Dispute Resolution, which states:

> In the event any dispute arises in connection with this Policy that cannot be resolved, the Insurer and the Insured shall participate in a non-binding mediation in which the Insurer and the Insured shall <u>attempt in good faith</u> to resolve such dispute. Either the Insured or the Insurer shall have the right to commence a judicial proceeding or, if the parties agree, a binding arbitration, to resolve such dispute. However, no judicial proceeding or arbitration shall be commenced until termination of the mediation and until at least 90 days has passed from the termination of the mediation. Each party will bear its own legal fees and expenses. The costs and expenses of a mediation, or an arbitration, shall be split equally by the parties. [emphasis added]

Pursuant to such provision, which was drafted by Ironshore, and included in the Ironshore Policy by Ironshore, EurAuPair, and any other insured, reasonably anticipated that:

    a. Ironshore would participate in the scheduled mediation in good faith, which certainly includes, but is not limited to, having the claims examiner participate in person, a normal requirement of virtually all mediation rules.

    b. Ironshore would work to schedule the mediation at the earliest possible date, so that the provision requiring a delay of 90 days "from the termination of the mediation" did not become simply a device for Ironshore to further delay the rights of an insured and to put further economic pressure on the insured to ignore or resolve a dispute.

    c. Ironshore would ensure that if any legal counsel attended to assist the claims examiner such counsel would have sufficient

experience to offer advice and to make decisions independent of any other attorney within that counsel's firm.

   d.   Ironshore would ensure that the person's personally attending the mediation on its behalf had full settlement authority, even if they elected not to exercise that full authority.

23.   On July 19, 2017, coverage counsel for EurAuPair sent an email to Alberti proposing 7 different dates, within 14 days, when EurAuPair and its counsel could attend a mediation. EurAuPair acknowledged that Alberti was on the East Coast, which is why it offered so many possible dates. Alberti indicated that none of those dates would work for him.

24.   On August 1, 2017, coverage counsel for EurAuPair sent an email to recently identified coverage counsel for Ironshore providing fourteen separate proposed dates for mediation, the latest of which was September 11-15. On August 2, 2017, coverage counsel for Ironshore indicated that September 11-15 would work, subject to choosing a mediator and subject to confirming the availability of the client.

25.   However, Ironshore failed and refused to send any confirmation. Therefore, on August 24, 2017, more than a month after first requesting the mandatory mediation required <u>by Ironshore</u>, coverage counsel for EurAuPair sent an email which described the situation:

> Before I send you all of my thoughts, let me BRIEFLY say – we first requested this mediation on July 19, 2017. We suggested 7 dates within 14 days of that date. Through a series of communications, on August 1 I sent you FOURTEEN new proposed dates, the latest of which was September 11-15. On August 2 you accepted (for your office) September 11-15. <u>Despite multiple requests you never told us which dates, if any, worked (or didn't work) for your client.</u> Since that time I told you that September 12-14 would work for us and you never

said that you or your client was unavailable. When I suggested a mediator who was available you said that you/your client wanted more choice. That's fine. <u>SO I SAID THAT YOU COULD CHOOSE ANY MEDIATOR YOU WANT ON ANY OF THE AGREED DATES</u>. Why, in any good faith world, would you come back and propose different dates, <u>and still not have confirmation from your client</u>? And, while we are agreeing to your choice of mediator, that was with the understanding that with all of Southern California to choose from you could find one qualified mediator who was available on our dates.

Before close of business today please give me a date (9/12-14) <u>when your client will be present for mediation</u> and the name of the mediator whose availability you have confirmed (I assume your office will also want to attend, but we are not making that a requirement).

As I expressed at the beginning of our discussions, I think that GOOD FAITH mediation make sense in these circumstances. And I am optimistic that, with a good mediator, we might be able to resolve the coverage issues. (But that is your choice – you get to decide if we will have a good mediator who might be able to resolve this dispute, or, at your options, a bad mediator who will be too biased or too uneducated. I am assuming that your client also wants a good mediator.)

NOTE: I assume that you, on behalf of your client, expressly reserve the right to disagree with the following. But I wanted to point out that the alternative dispute provisions are a condition of the policy. Therefore, we reserve the right to argue that IF a finder of fact determines that your client has not proceeded in good faith on this matter, they have not only waived their right to assert this condition,

but that they have also waived the right to assert any other condition or exclusion in the policy.  Let's avoid all those arguments by getting a mediation set 9/12-14, and getting it set today.  [underlining added]

However, notwithstanding multiple requests for Ironshore to confirm that Alberti (or some other client representative) would be attending, coverage counsel for Ironshore never gave any notice, in any form, that the only person who would be attending the mediation was the associate attorney, not anyone from the client and not even the partner from the coverage counsel.

26.     The parties ultimately agreed to hold a mediation on September 12, 2017 at Judicate West in Santa Ana with Robert Bennett.  The Judicate West "Scheduled Mediation & Financial Responsibility Confirmation," which EurAuPair is informed and believes, and therefore alleges, was duly signed by counsel for Ironshore, states (bold in the original): "**We strongly recommend that the principal parties and any person whose approval is needed for resolution attend in person, unless approved in advance by all parties and the mediator notified.**"  Notwithstanding that provision, Ironshore provided no notice to EurAuPair, or to the mediator, that only the associate attorney would attend, and that he would not have authority to resolve the matter.

27.     On September 12, 2017, the mediation was held at the Judicate West office in Santa Ana.  EurAuPair was represented by the most senior member of its outside coverage counsel and by Ce Parker, an executive representative of EurAuPair.  Robert Bennett was the mediator.  Ironshore appeared only through Tae Um, the associate attorney from the recently hired outside counsel for Ironshore.  Although he was informed that Alberti was available by telephone to Mr. Um, the arbitrator was never given the opportunity to even speak directly with Alberti.  Moreover, EurAuPair is informed and believes, and therefore alleges, that Um indicated that he did not have the authority to resolve the matter by agreeing

the Ironshore would provide coverage to EurAuPair for the Beltran suit. The mediator declared an impasse after only ½ of a day.

28. Pursuant to the terms of the Ironshore Policy Dispute Resolution provision, EurAuPair had been required to pay ½ of the fees for the mediation, which was $2,445. Further, EurAuPair was obligated to pay its coverage counsel to prepare a Mediation Brief and to travel to and attend the mediation, all at significant further financial expense to EurAuPair, even while the underlying Beltran Suit is continuing.

29. Based on the nature of Ironshore's conduct in this matter, EurAuPair is informed and believes that Ironshore has included and/or exercised the Dispute Resolution provision in bad faith as a means to delay and deter legitimate claims by insureds in California, and across the United States, and that Ironshore regularly, as its business practice: a) delays the scheduling of mediations; b) uses the excuse of the mediator availability to further delay the scheduling of mediations; c) fails to send the claims representative to attend the mediation in person; d) retains outside coverage counsel as a means to further delay the scheduling of the mediations; e) uses the excuse of the outside counsel availability to further delay the scheduling of mediations; f) sends representatives to mediations without full authority to resolve the coverage dispute; g) fails to provide the representatives with phone numbers, including home phone numbers, for senior claims executives who do have the authority to settle; h) fails to adequately review and reserve authority prior to mediations; i) fails to participate in mediations in good faith and then, after delaying for an extended period of time, assert that the insured is obligated to wait an additional 90 days before taking any further action to pursue the coverage dispute, knowing that the insured is continuing to incur costs of defense and potentially costs of settlement and/or judgment in the underlying matters without Ironshore conducting any substantial efforts to resolve the coverage dispute during

1  the ensuing 90 days, demonstrating that the provision was inserted not as a good
2  faith dispute resolution method but actually to frustrate and injure the insureds.

3       30.    Such conduct, as alleged in paragraph 29 of this Complaint, is contrary
4  to the impression which Ironshore attempts to provide to prospective and current
5  insureds. For example, the "2017 Claims Overview" which is posted on the
6  Ironshore website states "Our policies are our promises." It also states:

> Our personalized approach enables us to understand and respond to our clients' needs regarding claims management and fair resolution. It also saves time, provides the best possible protection and is the difference between a mere insurance provider and a true insurance partner. Equally important, our model enables our claims professionals to get to know our clients and the businesses they run. As a result, our claims staff continuously seeks ways to add value to our clients and their companies. It's one of the main reasons why Ironshore has such an innovative culture. Our unique claims structure <u>guarantees that you will always be working with the right decision makers</u> – no matter how diverse your product portfolio. Because at Ironshore, <u>the people who make the promises keep the promises</u>.
> [underling added]

These marketing statements are untrue and are actually contrary to the business practices of Ironshore which are actually designed to ensure that insureds, such as EurAuPair, are <u>not</u> given the opportunity to speak with the decision makers and, as a regular business practice, the people who make the promises are not even allowed to attend the mediation to keep the promises.

**Coverage Issues**

31.    The Ironshore Denial Letter states two grounds on which Ironshore is denying coverage to EurAuPair.

32. As evidence that Ironshore has proceeded in bad faith, and has simply made arguments without any reasonable basis, the first ground cited was stated, in the Ironshore Denial Letter, as "Because this claim arises from unpaid wages, Ironshore declines coverage for this matter pursuant to Exclusion III.F."

33. Alberti, and his supervisors at Ironshore who approved the Ironshore Denial Letter, made this statement with knowledge that exclusions are narrowly construed as a matter of law, particularly in California, and without any reasonable basis to believe that Exclusion III.F. applies to the Beltran Suit. What exclusion III.F. actually says is as follows:

> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured:
>
> . . . F. for any Claim arising out of, based upon, or attributable to the refusal, failure or inability of any <u>Insured to pay wages or overtime pay for services rendered (hereinafter, "Earned Wages")</u> (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions <u>taken by an Insured from any Employee</u> or purported Employee, including, but not limited to, (i) any unfair business practice alleged because of the failure to pay Earned Wages, or (ii) any Claim seeking earned Wages because any Employee or purported employee was improperly classified or mislabeled as "exempt"

The Beltran Suit does not allege that EurAuPair failed to pay wages, and the Beltran Suit does not allege that EurAuPair took improper payroll deductions because the Beltran Suit correctly acknowledges that EurAuPair does not employ any of the *au pairs*. Moreover, prior to the issuance of the Ironshore Denial Letter, Ironshore was specifically advised, by EurAuPair, that it did not employ any of the *au pairs* and that such exclusion therefore, by its own terms, could not be understood as applying to the Beltran Suit.

34. Notwithstanding the lack of any facts to support its denial of coverage, and with actual knowledge that its denial of coverage was factually unsupportable, Ironshore nonetheless issued the Ironshore Denial Letter refusing to provide coverage for EurAuPair.

35. The only other ground for denial was that the claim against EurAuPair, the Beltran Suit, was first "made" (i.e. – served on EurAuPair) during the earlier Ironshore policy period, rather than during the subsequent policy period of the Ironshore Policy, and ever though Ironshore insured EurAuPair continuously throughout that period of time, Ironshore contends that it should be excused from providing any coverage for the matter, notwithstanding the fact that Ironshore has not suffered any prejudice and notwithstanding the fact that such contention is contrary to the objectively reasonable expectations of any insured.

36. Under the circumstances presented here Ironshore's position constitutes an attempted forfeiture and a breach of the reasonable expectations of the insured. Ironshore has actually been benefitted by the delay in notification and certainly has not been harmed. Specifically, there has not yet been any trial in the Beltran Suit. None of the 15 defendants have been removed from the Beltran Suit as the result of a settlement or a motion or on any other basis. Thus, Ironshore cannot reasonably say that any opportunity was missed for earlier resolution, so that there has been no prejudice to Ironshore from the alleged delay in tender. Further, EurAuPair is informed and believes that even if Ironshore agrees to provide coverage, or if coverage is ordered by this Court, Ironshore will argue that it is only responsible for the payment of defense costs from the date of tender (April, 2016) forward, and not from the date of the first defense cost bill received by EurAuPair (March, 2015). In other words, even if Ironshore were to properly acknowledge coverage from the date of tender, Ironshore would still be <u>saving</u> about $55,000 more than if EurAuPair had tendered the Beltran Suit to Ironshore when it was first received by EurAuPair. In addition, because of EurAuPair's desire to maintain

continuity of insurers, in a futile attempt to avoid exactly this type of dispute, Ironshore sold another year of insurance to EurAuPair at a cost of about $25,000. In other words, since there isn't any other proper ground for denial, if EurAuPair had submitted this claim to Ironshore when it was first served on EurAuPair, the only change for Ironshore is that it would have about $80,000 less than if it acknowledged coverage now. So there has been no prejudice to Ironshore.

37. EurAuPair's decision to immediately defend the Beltran Suit, and to tender it to Ironshore only when it became clear that it wasn't a nuisance suit which could be defended for nominal expense, is actually consistent with the language in the Ironshore policy. For example, and without limitation, provision VI.C. states that "The Insured [EurAuPair], and not the Insurer, have [sic] the duty to defend all Claims . . ." That provision continues by indicating that "The Not-For-Profit Entity [EurAuPair] may at its option tender to the Insurer the defense of a Claim. Such a tender of a Claim shall not be made more than 90 days following notice of the Claim pursuant to Section VII. Upon such a tender of the defense of a Claim, the Insurer shall assume the duty to defend." So the Ironshore Policy says that EurAuPair, and not Ironshore, is responsible to defend the Beltran Suit. And the Ironshore Policy says that EurAuPair has the option to tender the claim, but only in the first 90 days, if it wants Ironshore to assume the duty to defend, rather than reimbursing counsel selected and controlled by EurAuPair. Here, EurAuPair chose not to tender within 90 days and waived that option, but should not be held to have permanently waived the right to request the alternative of reimbursement.

38. Other provisions of the policy reconfirm that if the claim is being handled within the retention amount, EurAuPair doesn't even need permission from Ironshore to settle the case. Section VI.B. states "if all Insureds are able to settle all Claims that are subject to an applicable Retention for an amount that, together with the Costs of Defense, does not exceed the applicable Retention, the Insured may agree to such a settlement without the prior written consent of the Insurer."

39. By its wrongful denial of coverage, Ironshore has breached the contract represented by the Ironshore Policy. Upon such breach EurAuPair is relieved of any further obligation to provide notice to Ironshore or to otherwise comply with any of the Ironshore Policy conditions.

40. Pursuant to California Insurance Code section 790.03(h), it is unlawful for an insurer to: (2) fail to acknowledge and act promptly upon tender of a claim; (3) fail to adopt and implement reasonable standards for prompt investigation and processing of claims; (6) compel insureds, such as Plaintiffs, to institute litigation to recover amounts due; and (13) fail to promptly provide a reasonable explanation for any denial of coverage.

## FIRST CLAIM FOR RELIEF
## DECLARATORY JUDGMENT

41. Plaintiff realleges and incorporates by reference, as though set forth in full, paragraphs 1 through 40 of this Complaint.

42. EurAuPair has incurred costs of defense and costs of settlement in relation to the Beltran Suit, which defense costs and settlement should properly be reimbursed by Ironshore.

43. Ironshore has indicated, by its failure to make any payment whatsoever, whether for defense or indemnity, that they disagree with the contentions of EurAuPair, as set forth in the previous paragraph.

44. There is an actual and present controversy between EurAuPair and Ironshore regarding the extent of the obligations of Ironshore under the terms of the Ironshore Policy such that this Court should issue a declaratory judgment in favor of EurAuPair, and against Ironshore, finding that there is, at a minimum, a duty to reimburse EurAuPair for the costs of defense of the Beltran Suit.

45. Further, EurAuPair is informed and believes that Ironshore contends that Euraupair, and all other similarly situated insureds, are obligated to comply with the Alternative Dispute Resolution provisions found in the Ironshore Policy

and in similar policies which are issued to other insureds across the United States. Such compliance includes, but is not limited to, the obligation to spend the time and money to participate in a pretense mediation (see, generally, paragraph 29 of this Complaint) and, further, that Ironshore contends that even after its belated bad faith mediation, the insured is obligated to wait an additional 90 days before proceeding with suit or arbitration.

46. EurAuPair hereby seeks a declaratory judgment, to be supported by a preliminary and a permanent injunction, finding that the Ironshore Alternative Dispute Resolution is null and void, not only for EurAuPair, but for all other insureds who are similarly situated, and that as a consequence of Ironshore's pattern and practice of bad faith mediation a declaratory judgment should be entered against Ironshore as follows:

   a. Ironshore is barred from asserting that any insured, including but not limited to EurAuPair, is required to pay any portion of the mediation fees and, to the extent that Ironshore has actually required any insured to comply with such provision, Ironshore must reimburse EurAuPair, and all other insureds, for such fees.

   b. Ironshore is barred from asserting that any insured, including but not limited to EurAuPair, is required to wait 90 days, or any other period of time, after the mediation has been completed, and Ironshore will notify all insureds, whether or not they have a pending claim, that such provision no longer has any legal effect and will, in any case where such provision has been asserted, advise the Court that Ironshore has been responsible for an unjustified delay of 90 days.

   c. As a consequence of requiring EurAuPair to expend significant time and money on a bad faith mediation, after specific notice from EurAuPair indicating that bad faith conduct would constitute a waiver of policy defenses, determine that Ironshore has, in

this matter, waived the right to assert any policy defenses, other than the policy limit and the retention, to the tender of coverage submitted by EurAuPair for the Beltran Suit.

47. In support of obtaining such injunction, and because EurAuPair may be irreparably harmed unless it can proceed with this lawsuit forthwith, EurAuPair will move this Court of an order allowing immediate discovery.

48. To the extent that the actions of EurAuPair here, in seeking and obtaining an injunction against Ironshore are determined to be a benefit to any and all other insureds to Ironshore, EurAuPair will seek to obtain an award of attorney fees from Ironshore, whether in its role as a Private Attorney General or any other.

## SECOND CLAIM FOR RELIEF
## BREACH OF CONTRACT

49. Plaintiff realleges and incorporates by reference, as though set forth in full, paragraphs 1 through 40 of this Complaint.

50. On or about May, 2016, and thereafter, Ironshore breached the Ironshore Policy by failing and refusing, and continuing to fail and refuse, to pay the full amount of all reasonable and necessary Defense Costs which were incurred by EurAuPair in defense of the Beltran Suit.

51. EurAuPair has been damaged in the amount of unreimbursed defense costs which it incurred in the course of responding to and defending the Beltran Suit. EurAuPair has also been foreseeably damaged by other consequential damages which it has incurred as described herein, and such others as may be subject to proof. EurAuPair does not know the precise amount thereof, but EurAuPair is informed and believes, and therefore alleges, that the total amount in dispute will be over $100,000.

## THIRD CLAIM FOR RELIEF
## BREACH OF THE COVENANT
## OF GOOD FAITH AND FAIR DEALING

52. Plaintiff realleges and incorporates by reference, as though set forth in full, paragraphs 1 through 40 of this Complaint.

53. Ironshore was obligated to and must pay for defense costs incurred by EurAuPair in defense of the Beltran Suit, in addition to any amounts for settlement and/or judgment.

54. The denial of coverage by Ironshore was unreasonable or, in the alternative, was undertaken without good cause, since it was contrary to the duties and obligations of the Ironshore Policy issued by Ironshore, and, in the alternative, it was contrary to the law, and it therefore constitutes a tortious breach of the covenant of good faith and fair dealing.

55. As a result of the breaches by Ironshore, EurAuPair has incurred substantial financial obligations to pay amounts for defense costs which amounts are properly covered under the Ironshore Policy, and it may incur financial obligations to pay amounts for settlement and/or judgment, and it has incurred also other damages which have potentially harmed the business of EurAuPair. EurAuPair also contends that it is entitled to the payment of interest from the date on which Ironshore should have reimbursed EurAuPair.

56. As a further proximate result of the breaches by Ironshore, EurAuPair has been required to expend attorney's fees and costs for experienced insurance coverage litigation counsel in order to obtain the insurance policy benefits to which it was entitled under the Ironshore Policy. Pursuant to the principles of *Brandt v. Superior Court* EurAuPair is entitled to reimbursement of such amounts from Ironshore. EurAuPair is informed and believes that the reasonable value of such damages will exceed the jurisdictional minimum of this Court.

57. The conduct of Ironshore, which was undertaken without a proper legal and/or factual basis, is contrary to the applicable legal principles, and is therefore conduct which is fraudulent, malicious or which evidences a conscious disregard for the rights of EurAuPair. Moreover, EurAuPair is informed and believes that such conduct is the regular business practice of Ironshore and has been utilized against other parties insured by Ironshore. Ironshore should therefore be required to pay punitive damages for the purpose of attempting to deter future unlawful conduct by them in an amount subject to determination by the trier of fact.

WHEREFORE, Plaintiff prays for judgment as follows:

ON THE FIRST Claim for Relief:

1. For a Declaratory Judgment in favor of Plaintiff and against Defendant on every issue properly brought before this Court.

2. For a preliminary and a permanent injunction barring Ironshore from enforcing the terms of the Alternative Dispute Resolution provision against any insured including, but not limited to, EurAuPair.

3. For early discovery.

4. For attorney fees in favor of Plaintiff in an amount appropriate to compensate plaintiff for the benefit provided to all other insureds of Ironshore.

5. Such other and further Declaratory Judgment as may appear proper at the time of determination.

ON THE SECOND Claim for Relief:

6. For all defense costs which are covered under the Ironshore Policy.

7. For all settlement and/or judgment amounts which are covered under the Ironshore Policy.

8. For interest on sums which were not timely paid to Plaintiff.

9. For all other damages incurred by Plaintiff as a result of any breach of contract.

ON THE THIRD Claim for Relief:

10. For all unreimbursed loss incurred by Plaintiff which amounts are properly covered under the Ironshore Policy.

11. For all other damages to compensate Plaintiff for harm to its business because of the wrongful conduct of Defendants.

12. For attorney's fees and costs incurred in this matter pursuant to the principles of *Brandt v. Superior Court*.

13. For punitive damages, subject to proof.

ON ALL Causes of Action:

14. For interest on all sums where properly owed.

15. For costs of suit incurred herein.

16. For such other and further relief as the court may deem just.

DATED: September 24, 2017

BUCHALTER
A Professional Corporation

By: /s/ by ECF
STEVEN BROWER
Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff EurAuPair hereby demands trial by jury as to each and every issue as to which it is so entitled.

DATED: September 24, 2017

BUCHALTER
A Professional Corporation

By: /s/ by ECF
STEVEN BROWER
Attorneys for Plaintiff